J-A08037-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| YASIN M. GARNETT | : | |
| Appellant | : | No. 1161 EDA 2025 |

Appeal from the Judgment of Sentence Entered April 23, 2025
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0000987-2023

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and KING, J.

MEMORANDUM BY PANELLA, P.J.E.:           **FILED JUNE 23, 2026**

Yasin M. Garnett appeals from the judgment of sentence entered in the Court of Common Pleas of Monroe County after he was convicted of various sexual offenses at a jury trial. On appeal, Garnett challenges the trial court's evidentiary rulings. After careful consideration, we affirm.

Garnett's convictions stem from the sexual offenses he committed against C.S. ("Victim"), his former paramour's daughter, who was nineteen years old at the time of trial. Garnett and Victim's mother dated and lived together for several years in both New York and Pennsylvania, and Victim considered Garnett her stepfather. At trial, Victim testified that when she was in third grade and living in New York, Garnett showed her pornography on his cellphone. *See* N.T. Trial, 9/11/24, at 27-28. Victim testified that she informed her mother of this incident, but her mother did not believe her. *See id.* at 28.

When asked whether Garnett subjected her to further illicit conduct, Victim testified as follows:

A.    It escalated from when I was about in fifth grade.

Q.    What happened then when you were in fifth grade?

A.    He started—we would rough house, as in he would play fight. So body slamming was involved, a lot of pressure points also involved. So, like, the side of my wrists, the back of my neck. And at that time, at certain points, we would be in my mom's room, and he would eventually, like, pull down my pants and put his fingers inside me. And then afterward, make me taste myself.

Q.    When you say he would put his fingers inside you, [] what part of your body are you talking about?

A.    My vagina.

Q.    And would he put just one finger? Or more than one finger?

A.    About two.

Q.    Okay, and what would he do after he did that?

A.    He would mostly just tell me to not bother telling my mom because she wouldn't believe me.

Q.    And did that happen one time or more than one time?

A.    More than one time, but very sporadically.

Q.    Okay. And you said after he did this, he ... made you do what with his fingers?

A.    Made me taste myself.

Q.    Okay. When he did that, did he say anything to you?

A.    It was mainly just regarding my mom, how she wouldn't believe me.

Q.      Okay, alright. And you said it would happen again but sporadically?

A.      Yes.

Q.      Okay. And would it be the same circumstances or different circumstances?

A.      Same. We would be in a room alone together and it would start off as play fighting, and it would happen again.

Q.      Okay, and when you say playfighting, you already gave a description. You said, like, using some pressure points, body slam. Now, I imagine ... he really didn't pick you up and slam you on the floor. Is it like pretend playing, stuff like that?

A.      Yes.

Q.      Okay, like a little play wrestling, different things like that?

A.      [nods affirmatively]

Q.      ... The first time this happened, did you understand what he was doing or why he was doing that?

A.      No, I was too young. I didn't ... find out [until] about the sixth grade.

*Id.* at 29-30 (unnecessary capitalization omitted). Victim testified that when these incidents occurred, she attempted to resist Garnett, "but he was too strong." *Id.* at 31.

Victim further indicated that after her family relocated to Pennsylvania, similar incidents involving Garnett occurred on at least three more occasions when she was in seventh and eighth grade. *See id.* at 32. When asked to further describe what happened during these specific incidents, Victim testified as follows:

A.   [W]e would start off play fighting and it would escalate from there.

Q.   And what would he do during these three other times?

A.   The same repeated things where it would come to my pants slightly being down and him inserting fingers inside of me and then making me taste myself.

*Id.* at 32-33.

The Commonwealth also presented the testimony of school counselor Nicole Cetta, Officer Jason Wilem, and Detective Erica Burk of the Pocono Mountain Police Department who testified to the disclosures of abuse that Victim made to each of them respectively. In reporting the incidents to each witness, Victim consistently disclosed that Garnett had inserted his fingers into her vagina. However, the specific details Victim provided to each witness varied. *See id.* at 82, 90, 118-20.

Additionally, the Commonwealth presented the testimony of Jo Ellen Bowman, who was qualified as a blind expert in sexual assault victim behavior. *See id.* at 140. Bowman testified that delayed disclosures of sexual abuse are common with children and that intra-familial abuse further complicates a child's willingness or ability to disclose abuse. *See id.* at 141-48. She further testified that it is not uncommon for children to disclose the details of sexual abuse in a piecemeal fashion. *See id.* at 150-51.

Garnett testified in his own defense and denied Victim's allegations entirely. *See* N.T. Trial, 9/12/24, at 29. Garnett indicated that he was rarely home alone with the children, but on the occasions that he was, it was for

- 4 -

brief periods of time. *See id.* 17. Garnett specifically denied that he ever roughhoused with Victim. *See id.* at 18-20.

When the defense called Victim's mother to testify on its behalf, she indicated that she did not believe Victim's initial allegations. *See id.* at 40-41, 48-49. However, Victim's mother testified that she had since come to believe Victim because Victim described specific sexual conduct that Garnett had also engaged in with her. *See id.* at 54.

On September 12, 2024, the jury convicted Garnett of one count of aggravated indecent assault by forcible compulsion and three counts each of aggravated indecent assault without consent, aggravated indecent assault of complainant less than 16, endangering welfare of children, corruption of minors, indecent assault by forcible compulsion, indecent assault without consent, and indecent assault of complainant less than 16.[1] Garnett was acquitted of three counts of unlawful contact with a minor[2] and two counts of aggravated indecent assault by forcible compulsion. On February 11, 2025, the court sentenced Garnett to an aggregate term of nine to eighteen years' imprisonment. The trial court summarized the subsequent procedural history of the case as follows:

_____

[1] 18 Pa.C.S.A. §§ 3125(a)(2), 3125(a)(1), 3125(a)(8), 4304(a)(1), 6301(a)(1)(ii), 3126(a)(2), 3126(a)(1), and 3126(a)(8), respectively.

[2] 18 Pa.C.S.A. § 6318(a)(1).

On February 21, 2025, the Commonwealth filed a motion for reconsideration of sentence arguing that [Garnett's] sentence for indecent assault by forcible compulsion does not merge with aggravated indecent assault by forcible compulsion because [Garnett] was only found guilty of one count of aggravated indecent assault by forcible compulsion. [Garnett] did not file any post-sentence motions; however, on February 24, 2025, [Garnett] filed a *pro se* motion [for collateral relief pursuant to the Post Conviction Relief Act ("PCRA").[3]] The PCRA motion was forwarded to [Garnett's] counsel [pursuant to Pa.R.Crim.P. 576(A)(4)]. Thereafter, his counsel filed a motion to appoint conflict counsel on March 11, 2025.

On April 23, 2025, the court granted the Commonwealth's [motion for reconsideration] and resentenced Garnett to the same [aggregate] sentence but structured the sentence so that [two] counts of indecent assault by forcible compulsion did not merge with [the single count of] aggravated indecent assault by forcible compulsion. On that same date, the court denied counsel's request to appoint conflict counsel.

On May 1, 2025, [Garnett] filed a *pro se* notice of appeal and on that same date, his counsel filed a motion for transcript. On May 5, 2025, the court issued an order directing [Garnett] to file a [Pa.R.A.P. 1925(b)] concise statement of matters complained of on appeal. On May 6, 2025, the transcript from [September 12, 2024], was filed and on May 20, 2025, [Garnett] filed a motion for extension of time[] to file [his] 1925(b) statement. On May 21, 2025, [the court entered an order] extending the time for [Garnett] to file his 1925(b) statement [to within 21 days after the filing of [the September 11, 2024] trial transcript[.] That transcript was filed on May 22, 2025, and the next day [Garnett] filed a *pro se* [1925(b)] statement. Thereafter, [Garnett], through his counsel, filed an amended [1925(b) statement] on June 11, 2025.

---

[3] 42 Pa.C.S.A. §§ 9541-9546.

Trial Court Opinion, 6/27/25, at 2-3 (unnecessary capitalization and footnote omitted). The trial court filed its opinion, pursuant to Pa.R.A.P. 1925(a), on June 27, 2025.

On appeal, Garnett presents the following questions for our review:

1. Whether the trial court erred when it allowed the Commonwealth to ask [Garnett] a "were they lying" question regarding [Victim's testimony] in this case[?]

2. Whether the trial court erred when it prohibited [Garnett] from impeaching [Victim's] testimony by presenting her prior inconsistent statement regarding substantially similar allegations[?]

3. Whether the trial court erred when it allowed the Commonwealth to inquire into character evidence in the form of [Garnett's] sexual conduct with a third party?

Appellant's Brief, at 4 (numbering and formatting altered).

In each issue, Garnett challenges the trial court's evidentiary rulings.

The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Brown*, 352 A.3d 1035, 1050 (Pa. Super. 2026) (citation omitted). This Court "will affirm a trial court's evidentiary ruling if the result is correct on any ground, without regard to the grounds on which the trial court relied." *Commonwealth v. Williamson*, 330 A.3d 407, 414 (Pa. Super. 2025) (internal quotation marks and citation omitted).

In his first issue, Garnett avers that the trial court erred in permitting the Commonwealth to ask Garnett a "were they lying" question when he testified in his own defense. ***See*** Appellant's Brief, at 21. As recounted above, at trial, Victim testified that, in each alleged incident of abuse, Garnett initiated contact with her by engaging in rough housing and ultimately inserted his fingers into her vagina. ***See*** N.T. Trial, 9/11/24, at 29-30, 32-33. Garnett's challenge is premised upon the following exchange that ensued when the Commonwealth questioned him on cross-examination:

Q.    [D]id you ever play fight with [Victim] at all?

A.    No.

Q.    You never roughhoused with her, play wrestling, anything like that?

A.    No, sir.

Q.    Alright.

A.    I don't even play with my own son like that.

Q.    Okay, and so she's making that part up?

A.    Yes.

N.T. Trial, 9/12/24, at 32. Defense counsel objected, and the court held a sidebar discussion during which counsel explained that it was within the province of the jury to determine whether Victim was "making this stuff up." ***Id.*** at 32-33. Additionally, counsel requested that the court issue a curative instruction. ***See id.*** at 33. The court overruled defense counsel's objection and

cautioned the prosecution to discontinue this type of questioning because it "potentially could be inappropriate." *Id.*

On appeal, Garnett maintains that "were they lying questions" are categorically prohibited, as such questions "undermine the jury's function to determine credibility, distract from reasonable alternative methods to resolve differing factual narratives, and generally shift the jury's attention from its role." Appellant's Brief, at 21 (internal quotation marks omitted). We agree that the trial court erred in overruling defense counsel's objection.

Generally, neither expert nor lay witnesses are permitted to testify to witness credibility, as "the question of a witness's credibility is reserved exclusively for the jury." *Commonwealth v. Yockey*, 158 A.3d 1246, 1255 (Pa. Super. 2017) (citation omitted). Accordingly, "'were they lying' questions are generally prohibited in Pennsylvania." *Id.* at 1256.[4] Furthermore, inadmissible witness testimony concerning the veracity of another witness is subject to harmless error analysis. *See id.*

By asking Garnett whether Victim fabricated the allegations of rough housing, the Commonwealth asked a prohibited "were they lying" question

---

[4] Federal courts similarly recognize that "asking one witness whether another is lying is inappropriate[,]" as "[s]uch questions invade the province of the jury and force a witness to testify as to something he cannot know, i.e., whether another is intentionally seeking to mislead the tribunal. ... [S]uch questions force defendants into choosing to either undermine their own testimony or essentially accuse another witness of being a liar." *U.S. v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006).

and thereby risked infringing upon the province of the jury to determine witness credibility. *See id.* However, this does not end our inquiry, as we must consider whether the trial court's error in overruling defense counsel's objection and permitting Garnett to express his opinion as to the veracity of Victim's testimony was harmless. *See id.*

In its 1925(a) opinion, the trial court concluded that the Commonwealth's "were they lying" question was harmless and "any perceived prejudice was *de minimis*." Trial Court Opinion, 6/27/25, at 5. Conversely, Garnett avers that the trial court's error was not harmless where "[t]here was no curative instruction, there was no other evidence that covered the subject that the question addressed, and the subject went to the core of the trial issues—the manner in which the sexual assault took place." Appellant's Brief, at 18. Garnett concludes that "[i]n a case where one witness is pitted against another witness, this is prejudicial error requiring reversal." *Id.* We agree with the trial court's determination that any error in overruling counsel's objection was harmless.

"An error may be considered harmless only if the appellate court is convinced beyond a reasonable doubt that the error could not have contributed to the verdict. Whenever there is a reasonable probability that the error might have contributed to the conviction, the error is not harmless." *Commonwealth v. Brunson*, 347 A.3d 808, 824 (Pa. Super. 2025) (internal

quotation marks and citations omitted). Accordingly, an error may be deemed harmless where:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* (citation omitted).

We are mindful that in cases involving "competing narratives about whether or not various sexual assaults occurred," the credibility of the complainant and the defendant is "a central issue." ***Commonwealth v. Jones***, 240 A.3d 881, 892 (Pa. 2020). However, a trial court can minimize the prejudicial impact of improperly admitted evidence by providing the jury with a curative or cautionary instruction, and we "presume[] that the jury will follow the instructions of the court." ***Commonwealth v. Kearney***, 341 A.3d 774, 783 n.7 (Pa. Super. 2025). In applying the harmless error analysis to cases involving "were they lying" testimony, this Court has, on several occasions, found harmless error where, *inter alia*, the trial court adequately instructed the jury on its ultimate and exclusive role in making credibility determinations. ***See Commonwealth v. Dula***, 262 A.3d 609, 635 (Pa. Super. 2021); ***Commonwealth v. Purnell***, 233 A.3d 824, 833 (Pa. Super. 2020);

***Commonwealth v. Logan***, 237 A.3d 1049, 2020 WL 3077936 at *5 (Pa. Super. filed June 10, 2020) (unpublished memorandum).[5]

The trial court's admission of Garnett's testimony concerning the veracity of Victim's allegations of rough housing was harmless error, as any resulting prejudice to Garnett was *de minimis*. ***See Brunson***, 347 A.3d at 824. While Garnett correctly notes that the trial court did not immediately issue a curative instruction following counsel's objection, ***see*** N.T. Trial, 9/12/24, at 31-34, the court nonetheless provided the jury with extensive instructions concerning credibility determinations prior to deliberations. ***See id.*** at 97-103. Moreover, the prosecution ceased its impermissible line of questioning following the parties' sidebar discussion. ***See id.*** at 34. Finally, by asking Garnett whether Victim was lying, the prosecution called Victim's character into question rather than Garnett's. Thus, under the present circumstances, we are convinced, beyond a reasonable doubt, that the Commonwealth's impermissible "were they lying" question did not impact the jury's credibility determinations, and consequently, its verdict. ***See Brunson***, 347 A.3d at 824. Accordingly, Garnett's first evidentiary challenge fails.

In his second issue, Garnett avers that the trial court erred in prohibiting him from impeaching Victim's testimony. ***See*** Appellant's Brief, at 38. On cross-examination, Victim indicated that no individual, aside from Garnett,

_____

[5] Pursuant to Pa.R.A.P. 126(b), we may rely on unpublished memorandum decisions filed after May 1, 2019 for their persuasive value.

had ever attempted to show her pornography, and denied that she had ever reported anyone else for showing her pornography. *See* N.T. Trial, 9/11/24, at 45. The Commonwealth objected to this line of questioning and to "going any further down that road" on the basis of relevancy. *Id.* at 46. At a sidebar discussion, defense counsel explained that it sought to impeach Victim's testimony by introducing text messages exchanged between Victim's mother and Garnett, in which Victim's mother allegedly informed Garnett that, in 2019, Victim accused her uncle of showing her pornography. *See id.* at 46. Specifically, defense counsel argued as follows:

> I can certainly impeach credibility pursuant to rule of evidence 608[6] on specific instances [of conduct] when they deny it on the stand. She just denied it, so I can ask her and now I can introduce it to impeach her credibility. In a case where—the entire case is credibility, Your Honor.

*Id.* at 47. The court sustained the Commonwealth's objection to this evidence. *See id.* at 48.

On appeal, Garnett avers that the trial court erred in prohibiting him from impeaching Victim's testimony by introducing evidence of prior inconsistent statements pursuant to Pa.R.E. 613. Notably, Garnett did not advance an argument pertaining to the admissibility of the text messages under Rule 613 at trial, and he is precluded from doing so at this juncture. *See Commonwealth v. Youngster*, 352 A.3d 1052, 1062 (Pa. Super. 2026)

_____

[6] *See* Pa.R.E. 608 (governing admissibility of evidence of a witness's character for truthfulness or untruthfulness).

- 13 -

(An appellant's "new and different theory for relief may not be successfully advanced for the first time on appeal.") (citation omitted); ***Commonwealth v. Culmer***, 270 A.3d 1117, 2021 WL 5755410 at *4 (Pa. Super. filed Dec. 3, 2021) (unpublished memorandum) ("An appellant cannot raise on appeal a legal theory in support of an objection or other issue if the theory is different from the theory advanced at trial. It is an appellant's duty to demonstrate where and how an issue and its supporting theory were preserved.") (citations omitted); Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Thus, Garnett has waived any argument concerning the admissibility of the text messages as prior inconsistent statements under Rule 613.

Moreover, even if Garnett had preserved the challenge he raises on appeal, his argument is unavailing. Rule 613, which governs the use of a witness's prior inconsistent statement for impeachment purposes, provides, in pertinent part:

> **(a) Witness's Prior Inconsistent Statement to Impeach.** A witness may be examined concerning a prior inconsistent statement ***made by the witness*** to impeach the witness's credibility. The statement need not be shown or its contents disclosed to the witness at that time, but on request, the statement or contents must be shown or disclosed to an adverse party's attorney.
>
> **(b) Extrinsic Evidence of a Witness's Prior Inconsistent Statement.** Unless the interests of justice otherwise require, extrinsic evidence of a witness's prior inconsistent statement is admissible only if, during the examination of the witness,

(1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness;

(2) the witness is given an opportunity to explain or deny the making of the statement; and

(3) an adverse party is given an opportunity to question the witness.

Pa.R.E. 613(a)-(b) (emphasis added).

In his brief, Garnett fails to explain how Victim's mother's purported assertion that Victim had previously accused her uncle of showing her pornography constitutes a prior inconsistent statement made by Victim that could permissibly be used to impeach Victim's credibility for purposes of Rule 613. **See** Appellant's Brief, at 38-43; Pa.R.E. 613(a). Furthermore, Garnett fails to explain how introducing the unauthenticated text messages, which were purportedly authored by Victim's mother and sent to Garnett, would be permissible under Rule 613(b) as extrinsic evidence of Victim's alleged prior inconsistent statements, where the statements contained therein were attributable to Victim's mother, and not Victim herself. **See McManamon v. Washko**, 906 A.2d 1259, 1268 (Pa. Super. 2006) ("An inconsistent statement can be admissible to impeach a witness'[s] credibility. However, it must be established that the witness, in fact, made the allegedly inconsistent statement.") (internal quotation marks and citation omitted). Therefore, we discern no abuse of discretion by the trial court in prohibiting Garnett from introducing Victim's mother's text messages to impeach Victim's credibility.

Accordingly, even if properly preserved, Garnett's second evidentiary challenge would fail.

In his third issue, Garnett avers that the trial court erred in permitting the Commonwealth to inquire into his sexual conduct with a third party. *See* Appellant's Brief, at 43. As recounted above, at trial, Victim's mother indicated that she initially did not believe Victim's allegations against Garnett. *See* N.T. Trial, 9/12/24, at 41. When the Commonwealth asked Victim's mother, on cross-examination, why she had since come to believe Victim, she testified that "[t]here is no way for my child to know those details, when Mr. Garnett and I used to do that in our bedroom as well." *Id.* at 53. Defense counsel objected to this testimony on the grounds that it constituted impermissible character evidence. *See id.* at 53. The Commonwealth disputed defense counsel's characterization of the testimony and argued that it was being offered for impeachment purposes. *See id.* The court overruled defense counsel's objection, and the Commonwealth proceeded with questioning Victim's mother as follows:

> Q.    I'm sorry, ma'am, I know this is tough, but what details were you talking about? And ... I know it's tough and I know this is very intimate and delicate, but this is very important. Could you explain what you're talking about?
>
> A.    Him playing with her vagina and then making her taste herself.
>
> Q.    Would he do the same thing to you?
>
> A.    Yes.

*Id.* at 54.

On appeal, Garnett maintains that the Commonwealth impermissibly introduced this evidence "to prove [his] propensity to engage in certain sexual acts." Appellant's Brief, at 46; *see* Pa.R.E. 404(b). Garnett summarily concludes that "[t]he trial court erred when it interpreted this as non-character evidence[.]" *Id.* We disagree.

Our Rules of Evidence permit "[a]ny party" to "attack the witness's credibility." Pa.R.E. 607(a). Accordingly, "[t]he credibility of a witness may be impeached by any evidence relevant to that issue, except as otherwise provided by statute or these rules." Pa.R.E. 607(b). Prior to the prosecution eliciting the testimony in question from Victim's mother, Garnett had denied having ever placed his fingers in Victim's mother's mouth after inserting them into her vagina. *See* N.T. Trial, 9/12/24, at 37-38. Victim's mother's subsequent indication that Garnett had engaged in this behavior with her during their sexual encounters directly contradicted Garnett's testimony. *See* N.T. Trial, 9/12/24, at 37-38. The testimony that the Commonwealth elicited from Victim's mother on cross-examination was proper impeachment evidence bearing on Garnett's credibility, which was a "central issue" at trial. *Jones*, 240 A.3d at 892. Therefore, we discern no abuse of discretion in the trial court's determination that Victim's mother's testimony was not prohibited character evidence. Accordingly, Garnett's third evidentiary challenge fails.

Based on the foregoing, Garnett is not entitled to his requested relief, and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/23/2026